# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00109-CV

### The Electric Reliability Council of Texas, Inc., Appellant

### v.

### Met Center Partners-4, Ltd., Appellee

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. GN300722, HONORABLE DARLENE BYRNE, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In this appeal, we must decide whether a landlord's notice of receipt of a bona fide offer trumps a tenant's exercised purchase option based on the terms of a right of first refusal in their building's lease. Electric Reliability Council of Texas, Inc. ("ERCOT") appeals the district court's take-nothing judgment declaring after a jury trial that, under the terms of the parties' lease, ERCOT's previously exercised option to purchase the building terminated when Met Center Partners-4, Ltd. gave ERCOT notice of a third party's bona fide offer.

ERCOT challenges the judgment by arguing that (i) Met Center did not receive a bona fide offer as a matter of law and the jury's finding of a bona fide offer should be disregarded as an immaterial answer to a legal question, (ii) the evidence was factually insufficient to support the jury's finding of a bona fide offer, (iii) the lease's right of first refusal did not trump ERCOT's

exercised purchase option, and (iv) Met Center could not invoke the right of first refusal because it repudiated the purchase option.

We conclude that (i) ERCOT waived any issue on the bona fide offer question, a mixed question of law and fact, by failing to object to the submission of the question during the charge conference, (ii) the evidence was factually sufficient to support the finding of a bona fide offer, (iii) the language of the parties' lease expressed their intent that the right of first refusal trump the purchase option, and (iv) the jury's findings of Met Center's repudiation were rendered immaterial by the court's declaration that the right of first refusal trumped the purchase option. Accordingly, we affirm the district court's judgment.

## BACKGROUND

**The Lease Terms**

ERCOT is a nonprofit corporation responsible for coordinating power transmission and preventing power outages throughout most of Texas. Met Center Partners-4, Ltd. is a real estate limited partnership that owns Building Three in a development at the intersection of State Highway 71, Riverside Drive, and State Highway 183 in Austin. Zydeco Development, Inc., is the company that is Met Center's sole general partner. Effective July 21, 2000, before the construction of Building Three, ERCOT leased the building from Met Center for a term of 120 months, renewable for two consecutive five-year periods. The leased premises in the completed shell of the building consisted of approximately 45,000 square feet. Met Center provided ERCOT a $20 per square foot finish-out allowance, a total of $900,000. After making ERCOT's requested changes to the shell of the building, Met Center paid ERCOT $315,274, the balance of the finish-out allowance. In addition

to these building modifications, ERCOT installed specialized equipment inside the premises to maintain the grid of electric transmission lines that serve most of the state.

The parties have had a strained relationship since the lease was signed. Met Center missed the building's targeted completion deadline. Displeased, ERCOT moved into the building without notifying Met Center. Upon discovering that ERCOT had occupied the building, Met Center demanded that ERCOT begin paying rent. ERCOT then began sending every rent payment with a statement that it was made "under protest." ERCOT and Met Center also disagreed about the cost of ERCOT's requested modifications to the building. The parties' mutual distrust culminated in the present litigation over the effect of Met Center's notice of its receipt of a bona fide offer on ERCOT's exercised purchase option.

"Exhibit D" to ERCOT's lease contained two purchase options and a right of first refusal for the property. The first purchase option in paragraph 2(a) gave ERCOT the right to purchase the property for a fixed price and was not subject to termination by the right of first refusal provisions in paragraph 2(c):

> (a) Tenant shall have the right to purchase the Property for a price of $5,850,000.00 payable in cash at the closing by giving Landlord written notice of Tenant's exercise of its right to purchase the Property at any time prior to the date on which the Tenant Improvements are substantially completed or the City of Austin issues a Certificate of Occupancy for the leased premises, whichever occurs first; provided Tenant is not in default hereunder at the time such right to purchase is exercised or at the closing of the sale and purchase of the Property pursuant thereto.

ERCOT did not exercise this pre-occupancy purchase option.

3

ERCOT did exercise the market-price purchase option under paragraph 2(b). This second option was available to ERCOT anytime during the term of the lease and was subject to termination by the right of first refusal in paragraph 2(c). This lease provision contained a formula for calculation of the purchase price and a method for selecting appraisers to resolve disputes over fair market value:

> (b) If Tenant fails to exercise its right to purchase the Property as set forth in (a) above, Tenant shall have a continuing right to purchase the property during the term of this Lease and provided Tenant is not in default hereunder at the time such right to purchase is exercised or at the closing of the sale and purchase of the Property pursuant thereto for a price equal to the Fair Market Value of the Property reduced by an amount equal to (1) the amount by which the fair market value of the improvements to the Leased Premises the cost of which have been paid by Tenant (exclusive of the Tenant Allowance) contributes to the Fair Market Value of the Property, (2) multiplied by a fraction, the numerator of which is the number of months remaining in the unexpired initial Term of this Lease, and the denominator of which is 60 months.[1] Tenant shall exercise its right to purchase the Property pursuant to the provisions of this paragraph (b) by giving Landlord written notice of Tenant's exercise of its right to purchase the Property ("Purchase Option Notice"). The Fair Market Value of the Property shall be determined as follows:
>
> (i) Within fifteen (15) days after the date of the Purchase Option Notice, Landlord shall give Tenant written notice of Landlord's determination of the Fair Market Value of the Property setting forth in reasonable detail the assumptions and data upon which such determination is made. If Tenant disagrees with Landlord's determination of the Fair Market Value of the Property, Tenant shall give Landlord notice of such disagreement, and of Tenant's determination of the Fair Market Value of the Property, within fifteen (15) days after the date of the notice of Landlord's determination of

---

[1] The jury found that the use of the number 60 as the denominator instead of 120—the total number of months in the lease's initial term—resulted from the parties' mutual mistake. The judgment reformed the lease, changing the fraction's denominator to 120 months. Thus, the reformed calculation was FMV – improvements' contribution to FMV – $900,000 x lease's remaining months/120 = price.

4

the Fair Market Value. In the event Tenant fails to so give Landlord notice of Tenant's disagreement with Landlord's determination of the Fair Market Value of the Property, Tenant shall be conclusively deemed to have accepted Landlord's determination of the Fair Market Value of the Property.

(ii) If Tenant gives Landlord notice of Tenant's disagreement with Landlord's determination of the Fair Market Value of the Property as provided in paragraph (i) above, Landlord and Tenant shall in good faith attempt to agree on the Fair Market Value of the Property. In the event Landlord and Tenant fail to agree on the Fair Market Value of the Property within sixty (60) days after the date of the Renewal Notice,[2] the Fair Market Value of the Property shall be determined by an appraisal in accordance with paragraph (d) below.

(iii) Landlord and Tenant shall attempt in good faith to mutually agree on an appraiser to make such determination. In the event Landlord and Tenant fail to agree on such appraiser within seventy-five (75) days after the date of the Purchase Option Notice, then Landlord shall select an appraiser and Tenant shall select an appraiser by giving the other party written notice of the name of the appraiser so selected within eighty (80) days after the date of the Purchase Option Notice. The two (2) appraisers so selected shall, within ninety (90) days after the date of the Purchase Option Notice, select a third appraiser, which third appraiser shall determine the Fair Market Value of the Property within thirty (30) days after the date of the selection of such appraiser. The Fair Market Value of the Property as determined by the appraisal shall be used to calculate the monthly Base Rent for the applicable extension term in accordance with paragraph (a) above. In the event either party fails to select an appraiser as provided herein, the appraiser selected by the other party shall determine the Fair Market Value of the Property. The cost of the appraisal shall be divided equally between Landlord and Tenant. Any appraiser selected hereunder shall (i) not be a partner, joint venturer or shareholder with Landlord or Tenant in any partnership, joint venture, trust or corporation, other than a partnership,

---

[2] The mention of a "renewal notice" is inapplicable because the lease was in its initial 120-month term. Met Center's counsel recalled ERCOT's former counsel testifying that the "renewal notice" phrase was an error. That remark did not draw an objection at trial and the phrase does not appear elsewhere in this purchase option or in the right of first refusal. Our review of the record suggests that the phrase may have been mistakenly copied from the "Renewal Options" section of the lease, immediately preceding the purchase options and the right of first refusal section.

trust or corporation whose shares or equity interests are publicly traded on a national stock exchange; (ii) shall not be owned or controlled by Landlord or Tenant; (iii) shall have been actively engaged for at least ten (10) years immediately preceding his selection in commercial real estate appraisal activities in the City of Austin, Texas; and (iv) shall be a member in good standing of the American Institute of Real Estate Appraisers.

Paragraph 2(c) contained the right of first refusal that Met Center invoked, which states that the provisions of the market-price purchase option will "cease and terminate" when Met Center delivers notice of a third party's bona fide offer to ERCOT:

> (c) Landlord further grants to Tenant a right of first refusal to purchase the property as follows[:]
>
> (i) *Notwithstanding the provisions of (b) above* [market-price purchase option], in the event Landlord receives a bona fide offer from a third party to purchase or acquire the Property that is acceptable to Landlord, Landlord shall not sell and convey the Property without first offering the same to Tenant upon the same price, terms and conditions as contained in the bona fide offer. Landlord shall give Tenant written notice of receipt of such bona fide acceptable offer, which notice shall contain the price, terms and conditions of such offer, together with a copy of such offer. *Upon delivery of such notice to Tenant, Tenant's right to purchase the property pursuant to paragraph (b) above shall cease and terminate.*

(Emphasis added.)

The next paragraph, 2(d), stated that "unless otherwise provided herein or under the terms of an offer," closing for the sale and purchase of the property would occur within thirty days after the date the option or right of first refusal was exercised. The closing did not occur.

6

**The Fair Market Value Dispute**

The events preceding the suit to construe the lease occurred in 2003 and most are documented in the parties' correspondence. ERCOT, through its president, Thomas Noel, exercised its purchase option in writing on January 8 and, in accordance with the lease, requested Met Center's determination of the property's fair market value within fifteen days, along with the reasonably detailed assumptions and data supporting its determination.

On January 21, Howard Yancy, Met Center's president, wrote to ERCOT acknowledging its exercise of the purchase option and said that "the purpose of [its] letter [wa]s to set forth Landlord's determination of the Fair Market Value of the Property in accordance with Paragraph 2(b)(i) of Exhibit D to the Lease Agreement [the market-price purchase option]."[3] Met Center then informed ERCOT that Daniel Macke of the Macke Company had been discussing the "potential purchase of the property" with Met Center, but Macke had not made an offer before Met Center received ERCOT's purchase option notice. Met Center also wrote that, after receiving the notice, it communicated ERCOT's exercise of its option to Macke, and Macke submitted a "back-up" offer for the property in the event that Met Center and ERCOT did not consummate the sale. Met Center enclosed a copy of a letter from Macke, dated January 17, offering to purchase the property for $6,885,000.

---

[3] All of the correspondence referenced is between Howard Yancy, president of Zydeco Development, Inc., Met Center's sole general partner, and Thomas Noel, president of ERCOT, unless otherwise noted.

The Macke letter stated its understanding that its offer was submitted "in a back-up position and that ERCOT ha[d] an option to purchase." In addition to the price, the Macke letter contained a general description of the property, deposit terms, and due diligence conditions.[4] It also proposed a closing timeline, a method for calculation of closing costs, a list of ten types of documents to be delivered to Macke "upon execution of the purchase agreement or earlier," and specified that its offer was only valid until 5:00 p.m. on January 21.[5] Macke's letter concluded by stating

> [t]his invitation is non-binding on either party. It must be understood that neither party has any binding obligation to the other until such time as a formal purchase agreement has been approved and executed by both parties and that neither this letter nor any past nor future oral communications between representatives of either party shall constitute a binding obligation.

Based on this letter, which Met Center called the "best evidence of fair market value" in its possession, Met Center told ERCOT that its determination of the property's fair market value was $6,885,000.

Disagreeing with that determination, ERCOT wrote to Met Center on February 4 and rejected the idea that "a conditional purchase offer [wa]s a true indicator of market value." Instead, ERCOT proposed that the fair market value of the property was the 2002 Travis County Appraisal

---

[4] Macke required thirty days from the date of an executed purchase agreement for reviewing documents, obtaining inspections, and "do[ing] that which, in the opinion of Buyer, [wa]s necessary." If unsatisfied with the results of such inspections and investigations, Macke reserved the right to terminate the purchase agreement without obligation or liability to Met Center.

[5] This was also the date of Met Center's response to ERCOT's purchase option notice. Met Center's subsequent reliance on Macke's offer shows that it did not expire on January 21.

District's assessed value of $4,231,483. ERCOT claimed it was entitled to a 40% credit from that figure as the amount that its improvements contributed to the property's fair market value.

Met Center responded by letter the next day, stating that it disagreed with ERCOT's proposed value of $2,538,890 ($4,231,483 less 40%), and reiterating that "there [wa]s no better determination of the fair market value than what a willing buyer would pay a willing seller for that property." Met Center said that if the property were purchased "in accordance with the terms and conditions of the Third Party Offer, the purchase price reflected therein would in fact be the Fair Market Value of the Property." With that in mind, Met Center suggested that Macke buy the property and that the lease agreement be revised to permit ERCOT to purchase the property from Macke if ERCOT paid at least the same price that Macke paid for it. Met Center observed that its proposal was "exactly what would have occurred had Tenant not sent Landlord the purchase option notice, except that Tenant would still retain the right to purchase the property for Fair Market Value." If that plan was unacceptable to ERCOT, Met Center offered to reduce the purchase price of the property by the amount of costs that it would incur under the Macke offer but not under the lease, such as the brokerage commission and the title insurance fee. Met Center also stated that it remained open to other ideas to determine the fair market value if ERCOT was still interested in buying the property.

ERCOT's letter to Met Center on February 13 voiced its dissatisfaction with Met Center's proposal because its estimate of fair market value did not include any credit for the amount that ERCOT spent on improvements. Regarding the Macke purchase, ERCOT questioned why Macke would want to purchase the property for $6,885,000 only to sell it to ERCOT at a loss.

9

ERCOT explained that if it retained its purchase option under the lease, it could still deduct the contributed value of its improvements from the asserted fair market value of $6,885,000. ERCOT complained that Macke's injection into the process unnecessarily complicated their effort to determine fair market value and the amount by which the improvements contributed to that value. It also noted that "[s]cenarios that might have occurred had ERCOT not exercised its purchase option are immaterial, as ERCOT did exercise that option." To resolve the matter, ERCOT suggested that they "split the difference" between their two offers for a value of $5,558,141.50. It conditioned this agreement on receiving a 40% credit toward the fair market value for its improvements.

The same day, Met Center rejected ERCOT's suggested value of $3,334,884.90 ($5,558,141.50 less 40%) in writing. Met Center also asserted that the improvements ERCOT paid for did not contribute to the fair market value of the property. Met Center suggested a meeting for further discussion.

Met Center sent another letter to ERCOT on February 19 to clarify that its first response to ERCOT's notice—despite being written as an acknowledgment of ERCOT's exercised purchase option and a proffer of fair market value under the purchase option—was intended to also invoke the right of first refusal.[6] Conceding that it was "not clear" in that regard, Met Center stated that this letter would serve as its notice to ERCOT of receipt of an acceptable, bona fide offer under the lease. In accordance with the lease's right of first refusal, Met Center invited ERCOT to

---

[6] Met Center's January 21 letter stated that its purpose was to set forth Met Center's determination of the property's fair market value in accordance with the purchase option. It also informed ERCOT that Macke had not made an offer on the property before Met Center received ERCOT's purchase option notice. The letter did not mention the right of first refusal.

purchase the property by matching Macke's offer. The same day, Met Center sent an e-mail to ERCOT requesting a meeting "to work out the fair market value/purchase price of Building Three."

Attorney Daniel Bitting wrote to Met Center on ERCOT's behalf on February 28 and expressed doubt about the validity of Met Center's purported invocation of the right of first refusal because ERCOT had previously exercised its purchase option. He also noted that he had not received his requested assurances that Met Center "acknowledged and would comply with ERCOT's contract to purchase the property under the purchase option." He further stated that ERCOT gave notice of its intent to purchase the property if Met Center's attempted invocation of the right of first refusal was finally determined to be valid and if ERCOT did not purchase the property under the purchase option. He concluded by confirming the parties' meeting scheduled for March 3.

Attorney Kathryn Allen wrote to ERCOT on Met Center's behalf on March 3, forwarding Macke's revised offer dated February 24, which was "given in substitution" for the first offer. The new Macke offer mirrored the former, including its specific designation as a non-binding invitation, but it deleted the sentence that recognized ERCOT's purchase option and characterized itself as a back-up offer. It also set a new acceptance deadline of 5:00 p.m. on March 3.

ERCOT, Met Center, and their respective counsel met on March 3. When it appeared that Noel, ERCOT's president, was detained, the parties began negotiating in his absence. They tentatively agreed on a price range with a $5.85 million floor and a $6.4 million ceiling. After Noel arrived at the meeting, he rejected the proposal. Both Met Center and ERCOT had appraisals of the property at the time of this meeting but neither of the corporate presidents knew that any appraisal existed. Noel was also unaware of an internal analysis that estimated the value of the property.

11

On March 31, Met Center made a "protective designation" of its appraiser to comply with the purchase option of the lease. Met Center specifically denied that the purchase option was operative. ERCOT designated its appraiser the same day. On April 22, Met Center notified ERCOT that Met Center had been "unable to confirm that the appraiser selected by ERCOT possesse[d] all of the qualifications" required by the lease. Met Center requested that ERCOT supply information or documentation supporting its appraiser's qualifications, but ERCOT did not respond.

**The Lawsuit**

Met Center filed suit on March 5 for declaratory judgment and reformation of the lease. ERCOT counterclaimed for declaratory judgment, breach of contract, specific performance, fraudulent inducement, unjust enrichment, and *quantum meruit*.[7] The court's charge asked the jury twenty-two questions, some with multiple subparts. During the charge conference, ERCOT did not object to question number 12 concerning Met Center's receipt of a bona fide offer.

At the conclusion of the trial, the jury found that ERCOT

- exercised its purchase option,

- was not in default under the lease at any time following the exercise of the option,

- was ready, willing, and able to perform all its duties and obligations under the option,

- failed to select an appraiser with the qualifications required by the lease and its failure to do so was not excused,

---

[7] ERCOT nonsuited its claims for unjust enrichment and *quantum meruit* during trial.

12

- did not fail to attempt to agree in good faith to the fair market value of the property prior to March 9, and

- was entitled to $275,400 of rent paid since the exercise of its option, plus attorney's fees.

The jury also found that Met Center

- did not commit fraud or statutory fraud by promising ERCOT a credit toward the purchase price of the property upon the exercise of the purchase option,

- repudiated the purchase option by (i) denying that ERCOT was entitled to credit for tenant improvements against the purchase price and (ii) denying that the option was operative, and its repudiation was not the result of mutual mistake, and

- received a bona fide offer acceptable to it for the purchase of the property.

The jury further found that the lease's use of 60 instead of 120 in the denominator of the fraction used to calculate fair market value was the result of the parties' mutual mistake.

ERCOT moved for judgment and requested that the court disregard the jury's answer to the bona fide offer question. Met Center moved for judgment seeking a declaration that the right of first refusal trumped the purchase option. Met Center also sought attorney's fees and reformation of the lease to change the denominator of the fraction used to calculate fair market value.

Based on the jury's affirmative response to the bona fide offer question, which triggered the right of first refusal, the district court's judgment stated:

IT IS FURTHER ORDERED, ADJUDGED, and FINALLY DECREED that declaratory relief be entered pursuant to paragraph 2(c) of EXHIBIT D to the Lease, upon delivery of notice to Defendant The Electric Reliability Council of Texas, Inc. of the offer presented by The Macke Company to purchase Building Three,

13

Defendant's right to purchase Building Three pursuant to paragraph 2(b) ceased and terminated in all respects, notwithstanding its effort to exercise rights under paragraph 2(b) by letter dated January 8, 2003.

The court ordered a take-nothing judgment on ERCOT's counterclaims against Met Center and assessed costs against ERCOT. ERCOT filed a motion for new trial, and Met Center filed a motion to modify the judgment requesting attorney's fees under the Uniform Declaratory Judgments Act. The court denied both motions. This appeal followed.

## ANALYSIS

**The Bona Fide Offer Question**

ERCOT argues that Met Center was not entitled to judgment because it did not receive a bona fide offer as a matter of law and that the bona fide offer question improperly asked the jury to decide a legal issue. *See*, *e.g.*, *Ergon, Inc. v. Dean*, 649 S.W.2d 772, 776 (Tex. App.—Austin 1983, no writ) (citing *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 253 (Tex. 1974)) (court should not submit special issue to jury that requires it to determine question of law). But when the court gave ERCOT the opportunity to comment at the charge conference, ERCOT did not object to the submission of the bona fide offer question or its accompanying instruction:

THE COURT: All right. Counsels, we're in the formal charge conference for Met Center vs. ERCOT case.

. . . .

THE COURT: Okay. Let's go to No. 12. Any objection from the plaintiff?

14

| | |
|---|---|
| [Counsel for Met Center]: | Your Honor, because the contract talks about bona fide and not the word binding, we object to the portion of the definition that talks about binding and would ask that this be limited to an instruction that a bona fide offer is one made in good faith. |
| [Counsel for ERCOT]: | No objection. |
| THE COURT: | Okay. Your objection, [counsel for Met Center], is noted and overruled. I think I got this language from one of the cases that was tendered to the court by the plaintiff. |

In order to avoid submitting questions of law to the jury, the trial court must examine the contract to determine what the contract requires of the parties. *Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 551 (Tex. App.—Dallas 1991, no writ). The court should submit to the jury any disputed *factual* issues regarding failure of a party to conform to the contract. *Id.* (citing *ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 253 n.3 (Tex. App.—Dallas 1990, no writ)). When the jury determines conduct, it is not making a decision on the law. *Id*. at 551-52; *see also Various Opportunities, Inc. v. Sullivan Invs., Inc.*, 677 S.W.2d 115, 120 (Tex. App.—Dallas 1984, no writ) (unnecessary for jury to determine legal effect of contract in order to determine factual ability and intentions to perform thereunder).

Question No. 12 asked the jury:

Did Met Center receive from the Macke Company a bona fide offer acceptable to Met Center for the purchase of the property?

You are hereby instructed that a "bona fide offer" is one made in good faith capable of being accepted so as to ripen into a valid and binding contract that could be enforced by any party to it.

15

Answer "Yes" or "No."

Here, the incorporated instruction on bona fide offer required the jury to determine a fact question on conduct—whether the offer was made in good faith—before it could find the existence of a bona fide offer.

The error of intermingling matters that were proper for the jury's determination with matters only the court should have decided is an error that is waived by failure to object to the charge. *Ballesteros v. Jones*, 985 S.W.2d 485, 499 (Tex. App.—San Antonio 1998, pet. denied); *see also* Tex. R. Civ. P. 274. Parties must timely and plainly make the trial court aware of a complaint about a jury charge and obtain a ruling to preserve error. *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 474 (Tex. 2004) (Wainwright, J., concurring) (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)). We conclude that Question No. 12 presented a mixed question of law and fact to the jury and that ERCOT waived this issue by failing to object to the submission of the question during the charge conference. We overrule ERCOT's first issue.

**Factual Sufficiency of Bona Fide Offer Finding**

ERCOT also challenges the factual sufficiency of the evidence supporting the jury's finding of a bona fide offer. When conducting a factual sufficiency review, we must consider all the evidence, both in favor of and contrary to the verdict, and will set it aside only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). ERCOT specifically claims that there is not

16

enough evidence to support the jury's finding that Macke intended to be bound by his letter to Met Center. Met Center argues that the record shows Macke made a good faith offer that was capable of ripening into a contract and that the offer was acceptable to Met Center.

Because ERCOT did not object to the jury charge, we review the sufficiency of the evidence on the bona fide offer question in light of the charge submitted. *See Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). In the absence of a proper objection, the court's charge is controlling, even if the charge is not entirely correct. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (sufficiency of evidence must be assessed "in light of the jury charge the district court gave without objection"); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

When ERCOT's counsel asked Macke about his definition of a "letter of intent," Macke testified that it was a letter explaining interest in pursuing the purchase of the property and that it was a nonbinding legal document. ERCOT's counsel further inquired:

> Q. Right, but does this—does this—did you intend by sending this letter itself to be bound to a contract to purchase the property?
>
> THE WITNESS: That was—that's the intent.
>
> [ERCOT's counsel]: Then what do you mean by saying that it's a nonbinding legal document?
>
> A. Well, what I mean by that is that it's just a letter of intent. I don't have a lot of the due diligence information in order

17

to truly evaluate whether or not that property makes sense on behalf of a client and so in order to determine whether or not that—something like that would really work, I would have to receive a lot more additional information; however, it's the basis of an understanding that would lead to a purchase agreement, which would be a binding agreement.

. . . .

Q.      Your offers of January 17 and February 24, you've already told us, were done with the authorization of Cherry Creek [Macke's client].  Is that correct?

A.      Yes.

Q.      And they were serious offers?

A.      Yes.

Q.      And they were made in good faith?

A.      Yes.

Q.      And at the time your intention was to purchase the buildings—or the building?

A.      Assuming that everything during our due diligence panned out, yes.

. . . .

Q.      Did Mr. Yancy ever inform you in writing that he found this letter of intent acceptable?

A.      No.

Q.      Did he ever tell you that orally?

A.      Not that I recall.

18

Yancy's testimony in response to questioning by ERCOT's counsel echoed Macke's understanding of the letter of intent as nonbinding and characterized the use of such letters as typical:

Q.  Was the Macke proposal, in fact, acceptable to Met Center?

A.  Yes.

. . . .

Q.  All right.  So you sent this [letter] to Reliability Council and you said, "There's somebody who's actually out there willing to buy the property at this price of $6,885,000.  They're willing to be bound to that price."  That's why you sent it to us, isn't it?

A.  Yes, that's—this is typical in real estate transactions of this size.  Typically, a third-part[y] buyer will send a letter of intent so the parties will agree to the substantive terms of the agreement to be followed immediately by—terms into a contract.

. . . .

Q.  Would it surprise you to learn that Mr. Macke testified . . . that he did not consider this to be a binding offer at all?

A.  No, because that's not how transactions of this nature are handled, in large commercial real estate transactions.  What was done was normal and customary, which is, one side presents a letter of intent to the other side which sets forth all the substantive terms or to reach agreement on that, to follow from that a purchase agreement is executed and the transaction is consummated.  That's why this language doesn't say if we receive a bona fide contract.  It's if we receive a bona fide offer.

Through Noel's testimony, ERCOT asserted that Macke's letter was intended to be nonbinding:

19

Q.  What was it about this Macke Company letter that caused you to give it little credence?

A.  Well, . . . it says, "We understand that we are submitting this offer in a back-up position." There were many caveats . . . with respect to all the things he wanted to do before, in my view, he offered nothing binding. And the fact that it expired four days after it was presented to us suggested to me that it was—it was described as a letter of intent. And I've seen letters of intent used many, many ways in my experience. They're also called letters of interest. They're not binding. They don't have any impact. That's the way, in my experience, they've always been handled. So I just saw this as, frankly, a fairly transparent attempt to establish a number that frankly was higher than any number I had ever heard expressed.

Review of the record shows that, although Macke testified that his letter of intent was nonbinding, there was testimony that his letter was a serious offer made in good faith and that he intended to purchase the building as long as the due diligence investigation "panned out." Macke and Yancy testified that due diligence conditions are typically included in real estate purchase agreements. Jurors are the sole judges of the witnesses' credibility and the weight to be given their testimony. *City of Keller v. Wilson*, 2005 Tex. LEXIS 436, at *39 (Tex. June 10, 2005). Reviewing courts cannot impose their own opinions to the contrary. *Id*.

In this case, after considering all the evidence, we cannot say that the jury's answer to Question No. 12 is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Accordingly, we conclude that the evidence was factually sufficient to support the finding of a bona fide offer that was acceptable to Met Center, and we overrule ERCOT's second issue.

20

**The Lease's Right of First Refusal Versus the Exercised Purchase Option**

ERCOT next asserts that the right of first refusal should not take precedence over the exercised purchase option. *See Sinclair Refining Co. v. Allbritton*, 218 S.W.2d 185, 188-89 (Tex. 1949). A right of first refusal, also known as a preemptive or preferential right, empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser. *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996). Such a right is distinct from a purchase option, which gives the holder the right to purchase at its election within an agreed period at a named price. *Allbritton*, 218 S.W.2d at 188. If the price is to be the market value of the premises at the time the option is exercised, then no price is specified. *Id*.

Because neither party in this case claimed that the lease was ambiguous, we may construe it as a matter of law. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650-51 (Tex. 1999). We review the district court's legal conclusions *de novo*. *Id*. at 651. In construing a lease, we ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). We consider the entire writing and attempt to harmonize and give effect to all its provisions by analyzing them with reference to the whole agreement. *Id*. at 312. Our construction is "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Id*. (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

By its terms, the lease between Met Center and ERCOT prioritized the right of first refusal over the purchase option. Paragraph 2(c)(i) states that the right of first refusal may apply

21

notwithstanding the purchase option provisions and that the purchase option will terminate when Met Center delivers notice of a third party's bona fide offer to ERCOT ("Upon delivery of such notice to Tenant, Tenant's right to purchase the property pursuant to paragraph (b) above shall cease and terminate.").  Significantly, the right of first refusal does not merely state that a dormant *right to exercise* the purchase option shall cease and terminate with the delivery of the bona fide offer notice; it states that upon delivery of such notice the Tenant's "*right to purchase*" the property pursuant to the purchase option shall cease and terminate.

In contrast to the right of first refusal, the market-price purchase option in section 2(b) lacks any language prioritizing it over another lease provision.  Additionally, none of the leases in the authority that ERCOT cites involved a market-price option with a right of first refusal that would cause the option to "cease and terminate" upon notice of a third party's bona fide offer, as in Met Center's lease with ERCOT.  *See*, *e.g.*, *Allbritton*, 218 S.W.2d at 186-87; *Pitman v. Sanditen*, 626 S.W.2d 496, 496-97 (Tex. 1981); *Tye v. Apperson*, 689 S.W.2d 320, 321 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.); *see also* Wanda Ellen Wakefield, Annotation, *Construction and Effect of Options to Purchase at Specified Price and at Price Offered by Third Person, Included in Same Instrument*, 22 A.L.R.4th 1293 (2004).

There was evidence that the parties were represented by counsel in their lease negotiations.  We determine the intent of the parties from what they actually expressed in the lease as written, not what they may have intended but failed to express. *Heritage Res. v. Nationsbank*, 939 S.W.2d 118, 130 (Tex. 1996).  As a rule, parties have the right to contract as they see fit as long as

22

their agreement does not violate the law or public policy. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 & n.11 (Tex. 2004).

Given the terms of the right of first refusal in the lease and the jury's affirmative finding on the bona fide offer question, the district court did not err in declaring that ERCOT's right to buy Building Three under the purchase option ceased, notwithstanding its effort to exercise its rights under paragraph 2(b), when Met Center delivered notice of Macke's offer to ERCOT. We overrule ERCOT's third issue.

**Jury's Finding that Met Center Repudiated the Purchase Option is Immaterial**

In its final issue, ERCOT argues that Met Center could not invoke the right of first refusal because the jury found that Met Center repudiated the purchase option by (i) denying that ERCOT was entitled to any credit against the purchase price of the property based on tenant improvements and (ii) denying that the purchase option was operative.

Repudiation consists of words or actions by a contracting party indicating that the party is not going to perform in the future. *SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 315 (Tex. App.—Dallas 2004, no pet.). It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract. *Id*. ERCOT argues that Met Center's repudiation of the purchase option amounted to a breach of the entire lease and that Met Center was no longer in a position to invoke the right of first refusal and compel ERCOT's compliance with that provision. *See Murray v. Crest Constr., Inc*., 900 S.W.2d 342, 344 (Tex. 1995). Met Center counters that the jury's findings that Met Center repudiated the lease are

rendered immaterial by the district court's ruling as a matter of law that the right of first refusal trumped the purchase option.

A question is immaterial when it should not have been submitted; when it calls for a finding beyond the province of the jury, such as a question of law; or when it was properly submitted but has been rendered immaterial by other findings. *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). A trial court may disregard the jury's finding on immaterial issues and render judgment based upon the remaining findings. *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 682 (Tex. App.—Austin 2002, pet. denied); *see also C&R Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966). Here, the court considered the jury's finding of a bona fide offer and correctly determined that Met Center's notice to ERCOT of Macke's bona fide offer to purchase Building Three trumped ERCOT's exercised purchase option based on the terms of the right of first refusal in their building's lease. Thus, the jury's findings that Met Center repudiated the lease were rendered immaterial by the district court's declaration that the right of first refusal trumped the purchase option. We overrule ERCOT's fourth point of error.

**CONCLUSION**

We have concluded that (i) ERCOT waived any issue on the bona fide offer question, a mixed question of law and fact, by failing to object to the submission of the question during the charge conference, (ii) the evidence was factually sufficient to support the finding of a bona fide offer, (iii) the language of the parties' lease expressed their intent that the right of first refusal trump the purchase option, and (iv) the jury's findings of Met Center's repudiation were rendered immaterial by the court's declaration that the right of first refusal trumped the purchase option.

24

Because the court did not err in declaring that Met Center's notice to ERCOT of Macke's bona fide offer to purchase Building Three trumped ERCOT's exercised purchase option based on the terms of the right of first refusal in their building's lease, we affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:  September 22, 2005